IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SHEILA L. WAYDICK,
     Plaintiff,

v.                                Case No. 3:11cv422/RV/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
     Defendant.

---

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

     Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, should be affirmed, and the application for benefits denied.

## PROCEDURAL HISTORY

On June 19, 2007, Sheila L. Waydick (who will be referred to by name, as plaintiff, or as claimant) applied for disability insurance benefits, alleging disability beginning on June 10, 2006, due to complications from hepatitis C and muscle, bone, and joint pain.[1]  T. 104-08, 146.[2]  The application was denied initially and upon reconsideration.  T. 61-63, 67-69.  Following the denial of these claims, claimant requested a hearing before an Administrative Law Judge ("ALJ").  T. 70.  At the administrative hearing, claimant amended her alleged disability onset date to March 13, 2007.  T. 35.  On November 13, 2009, the ALJ denied claimant's application for disability insurance benefits, determining that Ms. Waydick had not been disabled within the meaning of the Social Security Act.  T. 14-25.  The Appeals Council of the Social Security Administration denied plaintiff's request for review and the ALJ's decision became the Commissioner's final decision.  T. 1-3.  Claimant now seeks judicial review of the Commissioner's decision, arguing that "[t]he Commissioner erred in rejecting the opinions of Ms. Waydick's treating physicians and according determinative weight to the opinions of non-examining reviewing State Agency medical consultants in determining Ms. Waydick's residual functional capacity ("RFC")."[3]  (Doc. 12, p. 1).

---

[1] Ms. Waydick amended the disability onset date to November 1, 2005, before changing it again at the administrative hearing.  T. 109.

[2] The administrative record, as filed by the Commissioner, consists of 13 volumes (docs. 10-2 through 10-14), and has 574 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

[3] Although Ms. Waydick's brief articulates only one general argument, plaintiff really raises three issues. First, the ALJ erred by discrediting the opinions of plaintiff's treating physicians. Second, the ALJ erred by relying on the opinions of State consultants.  Third, there is new evidence

## FINDINGS OF THE ALJ

In the written decision the ALJ made a number of findings relative to the issues raised in this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant has not engaged in substantial gainful activity since March 13, 2007, the amended alleged onset date.

3. The claimant has the following severe impairments:  fibromyalgia, bipolar disorder, and history of chronic hepatitis C in current remission.[4]

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she is limited to simple, routine, repetitive tasks with no more than one or two-step job instructions; no work in crowds; and only occasional contact with the public.

In determining the claimant's RFC the ALJ wrote:

> I note that while [the hepatitis C] is in remission, it is not beyond the realm of possibility that there would be some fatigue associated with her condition and accordingly, I find that the hepatitis C would preclude strenuous work activity associated with medium, heavy, or very heavy work activity.   But lifting and carrying no more than 20 pounds

that supports a finding that claimant is disabled.

[4] The ALJ found that Dr. Michael Vandenberg diagnosed Ms. Waydick with bipolar disorder in April 2009.  T. 19.  It appears that this condition was actually diagnosed sometime in 2008, T. 384, 520, perhaps by Dr. William Wilson.  T. 401.

occasionally and ten pounds frequently, would not be precluded by her condition.

....

The claimant's physical impairments cause some limitations which prevent her from performing medium or heavier work.  However, there is no objective medical evidence showing that she cannot meet the physical demands of light work.

....

The claimant's mental impairment causes some limitation. However, she can perform simple, routine, repetitive tasks with no more than one or two-step job instructions.  In consideration of the claimant's mental impairment and any side effects from her medications, I have limited her to a range of light work which does not require complex or detailed job instructions, work in crowds, or more than occasional contact with the public.

I cannot find the claimant's allegations to be fully credible.  I note that two examining medical sources, Susan A. Danahy, Ph.D., and John F. Duffy, Ph.D., have questioned whether the claimant was malingering.

As for opinion evidence, I find persuasive the State agency medical consultants' opinions that the claimant can meet the physical demands of light work.  The State agency consultants are familiar with Social Security law and regulations and their opinions are consistent with the record as a whole.

I find somewhat persuasive the State agency psychological consultant's opinions that the claimant is moderately limited in the abilities to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods.  However, I find that the mental residual functional capacity in this decision is more consistent with the record as a whole.

Drs. Wilson and VandenBerg [sic] have offered opinions with significant physical and mental restrictions.   I find the opinions unpersuasive.  Although they are treating physicians, their opinions,

which indicate that the claimant can not even meet the physical demands of sedentary work, are not supported by their objective findings.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on May 27, 1964, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has a limited education and is able to communicate in English.

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 13, 2007, through the date of decision.  T. 19-25 (bold in original; some citation references deleted).

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'"  *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439).

Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986) (*quoting Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985)). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."[5] *Flynn*, 768 F.2d. at 1273; *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011). The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be

---

[5] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512. The Eleventh Circuit has explained the operation of step five:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that [she] is unable to perform

the jobs that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.  *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important RFC.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that RFC.  The ALJ establishes RFC, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  RFC is then used by the ALJ to make the ultimate vocational determination required by step five.[6]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[7]  20

---

[6] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[7] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).)  We will consider any statements about what you can still do that have been provided

C.F.R. § 404.1545(1).   Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

<u>FACT  BACKGROUND AND MEDICAL HISTORY</u>[8]

Sheila L. Waydick was born on May 27, 1964, and was forty-two years old at the time of her alleged onset of disability.  T. 36.  At the time of the ALJ hearing, she lived in Pensacola, Florida, with her mother, husband, and brother.   T. 36, 47. According to the findings of the ALJ, claimant suffers from the severe impairments fibromyalgia, bipolar disorder, and a history of chronic hepatitis C in current remission.  T. 19.  Claimant has an eleventh grade education, T. 37, and previously held jobs as a window foreman, grocery store deli manager, cashier, and fast food worker.   T. 52-53, 154, 215.   In June 2006, she discontinued her most recent employment as a window foreman because she felt the symptoms from her hepatitis C, including pain in her legs and feet, rendered her incapable of working.  T. 39.

Ms. Waydick believes her pain and memory loss arose as side effects from treatment for hepatitis C.  T. 41-42.  Claimant had been diagnosed with the condition

---

by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[8] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

in 2006.  T. 473.  She underwent interferon treatment for her hepatitis C from March to September 2007 and it went into remission.  T. 314, 384, 419.  During her treatment, claimant began complaining of body aches and pains.  T. 232.  In November 2007, after ceasing treatment because of a rash, Ms. Waydick reported that she was doing very well.  T. 314.

Ms. Waydick was examined by Richard W. Lucey, M.D., on August 14, 2007.  T. 257-62.  She complained to Dr. Lucey of general weakness, joint and muscle pain, as well as violent tendencies.  T. 257-58.  Dr. Lucey noted that claimant came to the examination in a wheelchair but could walk slowly when asked to.  T. 259.  Dr. Lucey also noted that she had some decrease in range of motion due to complaints of generalized weakness.  T. 259.

A series of psychological evaluations were then performed on Ms. Waydick.  Frank A. Brown, Ph.D., conducted the first evaluation on August 20, 2007.  T. 263-67.  Claimant complained to Dr. Brown of fatigue, memory loss, and "meanness" as side effects from her medication.  T. 263, 265.  Dr. Brown diagnosed her with depression but noted that she was exaggerating her memory problems.  T. 266.  To determine the true extent of her memory problems, Dr. Brown recommended more in-depth testing be performed.  T. 266.

On October 3, 2007, Susan A. Danahy, Ph.D., performed additional memory testing on Ms. Waydick.  T. 295-97.  Dr. Danahy found that claimant performed very poorly on memory testing.  T. 296-97.  Dr. Danahy noted that if this represented the actual level of functioning, claimant would be unemployable.  T. 295.  Dr. Danahy further noted that throughout the examination Ms. Waydick "was trying to look as debilitated and distressed as she possibly could."  T. 296.  Dr. Danahy found that

claimant's testing was probably not representative of her actual abilities and malingering was a serious possibility.  T. 295-97.

John F. Duffy, Ph.D., performed a third psychological evaluation of Ms. Waydick on November 6, 2007.  T. 298-300.  Like Dr. Danahy, Dr. Duffy conducted memory testing on claimant.  T. 298-99.  Dr. Duffy also noted that claimant may suffer from some neurocognitive impairment but found that claimant was not putting forth her full effort and was attempting to appear more impaired than she really was. T. 298-300.  Dr. Duffy based this conclusion in part on two facial recognition tests. In each test, plaintiff only recognized about twenty-five percent of the faces.  T. 299. Patients picking the pictures at random, however, tend to score at around the fifty percent level, leading Dr.  Duffy to believe that Ms. Waydick was making conscious incorrect choices.  T. 299.

Based on the psychological examinations discussed above and reports of Ms. Waydick's activities of daily living, James L. Meyers, Psy.D., completed a mental RFC assessment and Psychiatric Review Technique on November 19, 2007.  T. 320-37.   These reports noted that Ms. Waydick suffered from depression and had moderate limitations on her abilities to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods, but retained the ability to perform simple repetitive tasks.  T. 320, 322, 327, 336.  The reports also noted that plaintiff's reports of her functional level were much lower than those of third parties, leading Dr. Meyers to question Ms. Waydick's credibility.  T. 336.

On November 20, 2007, Patricia Sanders, a disability examiner, completed a physical RFC assessment.  T. 59, 338-45.  Sanders found that Ms. Waydick's

symptoms were partially credible but believed the severity of her symptoms was disproportionate to the expected severity of the medically determinable impairments. T. 343.  Sanders reached this conclusion because the purported severity of claimant's symptoms was inconsistent "with the total medical and non medical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alternations of usual behavior and habits."  T. 343.  Sanders noted that Ms. Waydick stated that she did not go grocery shopping.  A third party, however,  reported that she did go grocery shopping and drove herself.  T. 343. Sanders concluded that Ms. Waydick could stand/walk or sit for six hours of an eight-hour workday, lift ten pounds frequently and twenty pounds occasionally, and had no other limitations on her physical abilities.  T. 338-45.

Ms. Waydick's treating physician, William C. Wilson, D.O., completed a Physical Capacities Evaluation ("PCE"), Clinical Assessment of Pain ("CAP"), and Residual Functional Capacity Questionnaire ("RFQ") on January 4, 2008.  T. 346-49. In these documents, Dr. Wilson noted that claimant had the following limitations:  she could only sit or stand/walk for a total of one hour in an eight-hour workday; she could only lift or carry five pounds occasionally and never more than that; and she could not use her hands for repetitive actions such as grasping, pushing/pulling, or fine manipulation.  T. 346.  Dr. Wilson also found that plaintiff had an extreme restriction on her activities of daily living, extreme difficulty in maintaining social functioning, extreme mental limitations on her ability to perform activities in a work setting, and had experienced four or more episodes of decompensation.  T. 348.  He noted that Ms. Waydick's pain was serious enough to distract her from the adequate performance of her work and her medications' side effects would be severe and limit

her effectiveness.  T. 347.

Dr. Robert Schilling, Ph.D., completed a second mental RFC assessment and Psychiatric Review Technique on March 8, 2008.  T. 357-374.  Similar to the first mental RFC assessment, Dr. Schilling concluded that plaintiff had moderate limitations on her abilities to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods.  T. 371.  Dr. Schilling also concluded that claimant could still meet the demands of competitive work if she were limited to one and two-step instructions. T. 373.

Dr. Jack Dawson, M.D., completed a second physical RFC assessment on March 14, 2008.  T. 376-83.  After examining Ms. Waydick's medical records and reports of her activities of daily living, Dr. Dawson concluded that claimant's reported symptoms were disproportionate to those expected for an individual with her conditions.  T. 381.  Dr. Dawson also concluded that claimant was capable of standing/walking or sitting for six hours in an eight-hour workday and otherwise had no physical limitations. T. 376-83.  Dr. Dawson's report disputed the conclusions of Dr. Wilson's PCE and requested the records he had used to determine the significant limitations he placed on Ms. Waydick.  T. 382.

Dr. Wilson diagnosed plaintiff with fibromyalgia in January 2009.  T. 388. After an examination in April 2009, Dr. Michael Vandenberg, another treating physician, concurred in the diagnosis of fibromyalgia.  T. 473-74.  Dr. Vandenberg noted that claimant experienced pain in seventeen of the eighteen fibromyalgic tender points, T. 473-74, indicating that Ms. Waydick suffered from the condition.

Dr. Vandenberg also completed a PCE, CAP, and RFC Questionnaire on

August 19, 2009.  T. 464-67.  Like Dr. Wilson, Dr. Vandenberg found significant limitations on Ms. Waydick.  Dr. Vandenberg found she could only sit or stand/walk for a total of one hour in an eight-hour workday and only lift or carry up to ten pounds occasionally.  T. 467.  He also noted that claimant had an inability to use her hands for pushing/pulling or fine manipulation, pain present to such an extent as to be distracting from work activities, and side effects from medication severe enough to limit her effectiveness due to distraction, inattention, or drowsiness.  T. 466-67.  Additionally, Dr. Vandenberg reported that Ms. Waydick had moderate restrictions in activities of daily living and social functioning, marked deficiencies in concentration, persistence, and pace, and had experienced four or more episodes of decompensation.  T. 464.

## HEARING BEFORE THE ALJ

Ms. Waydick testified she is unable to perform household chores, and drives only occasionally due to the effects of her medication.  T. 47-48.  She occupies her day by watching TV, reading, and playing puzzles on a computer.  T. 48.  She stated she could only sit for an hour or less at a time and spends most of the day alternating between laying down on her bed and sitting on her couch.  T. 50.  She will spend around three to three-and-a-half hours of the day laying down.  T. 50.  Plaintiff also testified that she attends church and goes on motorcycle rides with her husband when her condition allows.[9]  T. 46-47.

---

[9] While getting off a motorcycle in May 2009, Ms. Waydick suffered a broken leg that required surgery.  T. 423-24.  She reported residual pain from the injury at the ALJ hearing but did not argue in her memorandum to this court that the injury should contribute to a finding of disability. T. 49.  In August 2009, a treating doctor reported the leg was doing well and complaints of pain from claimant were related to fibromyalgia and not the leg injury.  T. 463.

Claimant did not state that her condition has gotten progressively worse since the end of her treatment for hepatitis C, but she did indicate that the symptoms she experiences vary in severity from day to day.  T. 43.  Ms. Waydick stated the medications she takes to treat her symptoms help some, but do not fully alleviate her pain.  T. 44.

After claimant's testimony, the ALJ considered whether claimant's RFC allowed her to perform work that would preclude her from qualifying as disabled.  To make this determination, the ALJ relied on the testimony of vocational expert Barry W. Murphy.  T. 17, 25.  The ALJ asked the expert to consider the employability of several hypothetical people with the same work history, age classification, and education as Ms. Waydick .  T. 55.  The first hypothetical person was limited to lifting and carrying no more than twenty pounds occasionally and ten pounds frequently.  T. 54. The individual was also restricted to jobs with simple, routine, and repetitive tasks, no more than one or two-step job instructions, no work in crowds and only occasional contact with the public.  T. 54.  Based on these restrictions, the vocational expert concluded that this person would be unable to perform any of Ms. Waydick's past work because of the inability to interact with the public and inability to follow complex instructions.  T. 54.  The vocational expert, however, did conclude that there were some jobs that such a person  could perform, including jobs as a bench assembler, light housekeeper, and non-postal mail clerk.  T. 55.

The ALJ then added the restriction that the person would need the option to alternate between sitting and standing.  T. 55.  The vocational expert testified that such a person could perform jobs as a bench assembler, mail clerk, and packer. T. 55.  The next hypothetical person the ALJ formulated had the following restrictions:  no

lifting and carrying more than ten pounds; no standing more than a total of one hour in an eight-hour workday; no sitting more than one hour at a time and no more than two hours in an eight-hour workday; no overhead reaching; and no pushing or pulling.  T. 56.  The third hypothetical person could perform postural activities no more than occasionally and would need to leave work up to four times during a month.  T. 56.  The vocational expert testified that such a person would be unable to perform any job.  T. 56.

<u>ANALYSIS</u>

On this appeal, plaintiff argues the ALJ committed reversible error by "rejecting the opinions of [her] treating physicians and according determinative weight to the opinions of non-examining reviewing State Agency medical consultants." (Doc. 12, p. 4).  As noted earlier, Ms. Waydick's brief really addresses three issues: the treating physicians' testimony should not have been rejected; the State agency consultants' opinions should not have been relied on; and there was new evidence introduced after the ALJ's decision to support the finding that claimant is disabled.  A discussion of each of these issues follows.

Treating physician testimony must be given substantial weight unless good cause is shown to the contrary.  *Lewis v. Callahan*, 125 F.3d 1435, 1440 (11th Cir. 1997).  "Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.

As an initial, and important, consideration, the opinions of Ms. Waydick's treating physicians, Drs. Wilson and Vandenberg, were offered on preprinted check-off forms that did not refer to any evidence in the record supportive of the limitations they placed on claimant's ability to work.  T. 346-50, 464-67.  Courts have found that these preprinted forms do not provide persuasive evidence of the validity of the opinions expressed therein.  *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." (*citing Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))).  Due to the lack of objective evidence cited in the opinions of Drs. Wilson and Vandenberg, these opinions would be classified as conclusory. Thus, the persuasiveness of these opinions stands diminished at the outset.

Ms. Waydick asserts, however, that the ALJ should not have rejected her treating physicians' opinions based on a lack of objective evidence because one of her conditions, fibromyalgia, is characterized by lack of objective evidence.  (Doc. 12, p. 8).  In regard to fibromyalgia, the Eleventh Circuit has recognized that the condition "often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms."  *Moore v.  Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  The Eleventh Circuit has also observed, "The lack of objective clinical findings [of fibromyalgia] is . . . insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional limitations." *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 64 (11th Cir. 2010) (*citing Green-Younger v. Barnhart*, 335 F.3d 99, 105-08 (2nd Cir. 2003)).  Similarly, a plaintiff's

subjective complaints of fibromyalgia's effects cannot be discredited solely on the lack of objective findings.  *See Moore*, 405 F.3d at 1212 (finding claimant's complaints of fibromyalgia can be discredited only when based on facts other than lack of objective evidence).  The lack of objective findings in fibromyalgia cases, though, means a determination of the condition's effects hinges largely on the credibility of the plaintiff.  *See Somogy*, 366 F. App'x at 64 ("Given the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and the functional limitations caused thereby.").  Often, and certainly here, severity, not existence, is key to the role of fibromyalgia in a disability determination.  As the Seventh Circuit has noted:

> There is no serious doubt that [claimant] is afflicted with [fibromyalgia] but it is difficult to determine the severity of [the] condition because of the unavailability of objective clinical tests.  Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citation omitted).

"Credibility determinations are the province of the ALJ."  *Moore*, 405 F.3d at 1212 (*citing Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)).  It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984).  If the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain, he must do so explicitly and give reasons for that decision.  *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  Of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  *Wilson v. Barnhart*, 284

F.3d 1219, 1225-26 (11th Cir. 2002); *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005).

In the instant case, the ALJ concluded that Ms. Waydick's subjective complaints about her condition lacked credibility.  T. 23.  The ALJ cited the reports of two psychologists, Drs. Danahy and Duffy, to support her conclusion that claimant was not entirely credible.  T. 23.  In an examination on October 3, 2007, Dr. Danahy noted that Ms. Waydick "was trying to look as debilitated and distressed as she possibly could."  T. 296.  Dr. Danahy also noted a good possibility that claimant was malingering and not putting forth optimal effort on her mental test.  T. 295-97.  Similarly, in an examination on November 6, 2007, Dr. Duffy expressed his concern of a serious possibility that Ms. Waydick was malingering, noting that her performance on a faces recognition test was significantly worse than a person who merely chose the pictures randomly, indicating a conscious choice to appear more impaired than she really was.  T. 298-300.

The record also contains instances where Ms. Waydick's accounts of her daily activities were found to be inconsistent.   In a Psychiatric Review Technique completed on November 19, 2007, Dr. Meyers ascribed only partial credibility to plaintiff and noted that there were discrepancies in the functional level claimed by Ms. Waydick and the functional level reported by third parties.  T. 336.  Dr. Schilling also noted that claimant was able to extensively describe the  memory testing she had undergone to her Social Security Administration Examiner, indicating her recall was better than testing demonstrated.  This would be consistent with Dr. Danahy's and Dr. Duffy's opinions that Ms. Waydick was malingering.  T. 369.  Two examining

psychologists' opinions that plaintiff was likely exaggerating the seriousness of her condition and inconsistencies in the plaintiff's reports of her daily activities provided substantial evidence for the ALJ to conclude that claimant was not entirely credible. *See Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 664 (11th Cir. 2010) (holding ALJ did not err in finding claimant incredible in part because doctor noted she might be embellishing symptoms). Because the ALJ determined that Ms. Waydick's subjective complaints about the severity of her condition were not credible, the decision to give little weight to her doctor's reports detailing the limitations caused by fibromyalgia (based on subjective complaints) was permissible.

The ALJ also had additional reasons to discount Dr. Wilson's and Dr. Vandenberg's opinions concerning Ms. Waydick's functional limitations. Each doctor's RFQ indicates that claimant has suffered from four or more episodes of decompensation.[10] T. 348, 464. There is no evidence in the record (such as hospitalizations or treatment from psychiatrists) to support the assertion that claimant has suffered from multiple episodes of decompensation, indicating these physicians' reports are contrary to the record.[11] Prior to the completion of these forms, the only

---

[10] Although claimant's brief refers to episodes of decompensation, (Doc. 12, p. 7), the RFQs completed by Ms. Waydick's doctors actually use the word "decomposition" instead of "decompensation." T. 348, 464. Decomposition is defined as "the separation of compound bodies into their constituent principles," DORLAND'S POCKET MEDICAL DICTIONARY 233 (27th ed. 2004), and has no relevance in the mental health context. Although we may assume the reference is actually to decompensation, the discrepancy nonetheless evidences lack of attention to detail (and a rather important detail) by the physicians in question.

[11] "Decompensation" is defined under 20 C.F.R. Part 404, Subpart P, Appendix 1, in section 12.00 Mental Disorders:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties

mental health examinations reflected in the record are the State psychological consults and a neurological evaluation regarding memory loss.  T. 263-67, 295-300, 518-525.   Additionally, while filling out a form about her medical history, Ms. Waydick indicated that she had only come close to having a nervous breakdown.  T. 472.  These facts suggest claimant has never truly experienced a documented episode of decompensation, a rather serious manifestation of mental symptoms.  Moreover, the ALJ quite logically questioned why Dr. Vandenberg and Dr. Wilson, who are not psychiatrists, would treat claimant's mental impairment instead of referring her to a psychiatrist.  T. 24

The ALJ noted another inconsistency that supported the conclusion that Dr. Vandenberg's opinion was not entitled to great weight.  T. 24.  Dr. Vandenberg's PCE indicated that claimant could sit for two hours at one time but for only one hour total during an eight-hour workday.  T. 467.  Although this may appear as a minor discrepancy, it does constitute evidence that Dr. Vandenberg's PCE was not carefully completed.  Additionally, both Dr. Vandenberg's and Dr. Wilson's opinions indicate that claimant has to lay down for at least six hours in an eight-hour workday.  T. 346, 467.  Claimant's own testimony at the ALJ hearing, however, undermines these opinions because she testified that she lays down for only three to three-and-a-half hours a day.  T. 50.  In sum, the lack of objective evidence, the plaintiff's lack of

---

in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. . . .  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

credibility, and the inconsistencies in the doctors' reports provided the ALJ with good cause to reject the opinions of Ms. Waydick's treating physicians regarding her functional limitations.[12]

     The second issue raised in Ms. Waydick's brief concerns the ALJ's decision to rely on the State agency medical consultants' reports. (Doc. 12, pp. 11-13). Plaintiff takes issue with the fact that the State consultants' opinions were based on an incomplete medical record because they lacked some information from Drs. Wilson and Vandenberg. (Doc. 12, p. 11). She also notes the State opinions were two years old at the time of the ALJ's decision. (Doc. 12, p. 11). Plaintiff specifically complains that the physical RFC assessments completed by Sanders and Dr. Dawson were based only on a diagnosis of hepatitis C. (Doc. 12, p. 12). While these RFC assessments may have been completed prior to claimant's diagnosis of fibromyalgia, both Sanders and Dr. Dawson were aware of complaints of bone, joint, and muscle pain. T. 339, 377. Furthermore, the additional information from Dr. Wilson mainly consists of routine check-ups that document claimant's complaints of joint pain, memory loss, and mood swings. T. 386-414. Likewise, the additional evidence from Dr. Vandenberg notes Ms. Waydick's subjective complaints of memory loss and discomfort. T. 468-93. Dr. Vandenberg's reports do indicate that claimant had good range of motion and no swelling in her upper and lower extremities. T. 473, 481, 492-93. These additional records, then, consist mainly of reports of claimant's subjective complaints (found to be incredible) and do not offer

---

[12] The ALJ also found the opinion of a third treating physician, Dr. Lanway Ling, unpersuasive. T. 24. Plaintiff has not challenged this finding of the ALJ in her memorandum to the court.

the sort of objective evidence necessary to contradict the findings of the State consultants or ALJ.

Another telling point is that plaintiff has not chosen to argue that her condition has gotten progressively worse since the consultants' reports were completed. (Doc. 12, p. 13). Plaintiff requested a new consultative examination in order to supplement the record or resolve a "conflict, inconsistency, ambiguity, or insufficiency" in the record. (Doc. 12, p. 13). Ms. Waydick did not choose to request one on the basis that her condition had changed since previous examinations. *See* 20 C.F.R. § 404.1519a(b)(4) (2012) (specifying consultative examination may be ordered when "[t]here is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established").[13]  In this case, there was no need to order another consultative examination. Although the ALJ has an affirmative duty to ensure that a full and fair record is developed, *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995) (*citing Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. Unit B July 1981)), when an ALJ has sufficient information to make a decision, he can do so. *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate for a decision, no showing of prejudice is made).

Claimant also contends that the ALJ's "failure to include functional limitations in concentration, persistence and pace is inconsistent not only with the treating physicians' opinions, but also the opinions of the State Agency consultants." (Doc. 12, p. 17).  Contrary to this assertion, however, the ALJ did include functional

---

[13] This provision, which was renumbered in the current version of 20 C.F.R. § 404.1519a, also appears in the older version cited in plaintiff's memorandum.

limitations on Ms. Waydick when he limited her to "simple, routine, repetitive tasks with no more than one or two-step job instructions; no work in crowds; and only occasional contact with the public." T. 21.  These limitations were largely consistent with those advocated by Drs.  Meyers and Schilling in their mental RFC assessments. T. 322, 373.  In some respects, the ALJ's limitations were actually more stringent than the ones proposed by the State consultants, in that Dr. Schilling felt that "there are no restrictions in [Ms. Waydick's] abilities to socially interact and adapt," T. 373, while the ALJ limited her contact with the public.  T. 21.  Based on the above considerations, it was not improper for the ALJ to rely on the State consultants' reports because the consultants cited the objective and subjective evidence they relied on to make their assessments, and the consultants' opinions were consistent with the record as a whole.  T. 320-45, 357-73, 377-82; *see Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 902 (11th Cir. 2012) (holding ALJ did not err when he did not give treating physician opinion controlling weight because it was unsupported by medical record, and instead chose to give significant weight to non-examining physician opinions because they were consistent with record).

The final issue Ms. Waydick addresses concerns the introduction of evidence subsequent to the ALJ's decision.  (Doc. 12, p. 18).  When claimant requested a review of the ALJ's decision from the Appeals Council, she submitted additional evidence of her medical condition that was not available to the ALJ.  T. 1-6.  "The Appeals council must consider new, material, and chronologically relevant evidence and must review the case if 'the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" *Hoffman v. Astrue*, 259 F. App'x 213, 220 (11th Cir. 2007) (*quoting* 20 C.F.R. § 404.970(b)

(2012)).  Specifically, claimant relies on a psychiatric assessment conducted by Kaberi Samanta, M.D., in April 2010, that notes claimant suffers from severe depression, feels helpless and hopeless, is socially isolated and withdrawn, and has a lack of interest, energy, or motivation.  T. 547-48.  In the very same evaluation, though, Dr. Samanta noted that claimant was cognitively intact and had average intelligence.  T. 547.  Although Dr. Samanta also reported "at this time, [claimant] does not work," the doctor never expressed the opinion that claimant was incapable of working.  T. 548.  It was not unreasonable for the Appeals Council to determine this and other new evidence did not provide a sufficient basis for changing the ALJ's decision when it denied claimant's request for review of the decision.  T. 1-6.  *See Hoffman* 259 F. App'x at 220 (holding remand to Commissioner not warranted because additional evidence would not change outcome).  In fact, some of the additional evidence even provides more support for the findings of the ALJ.  A report from a neurological evaluation on March 25, 2008, notes Ms. Waydick's memory problems and depression but also that she continues to perform all her activities of daily living, including cooking and taking care of the house.  T. 520.  This evaluation occurred shortly after Dr. Wilson issued his opinion with significant limitations, lending further support to the ALJ's treatment of Dr. Wilson's opinion.   The evaluation also appeared the same month that Dr. Dawson completed the physical RFC assessment upon which the ALJ relied, corroborating the ALJ's finding.  T. 23, 376-83.

Based on the foregoing analysis, the ALJ's decision to reject the opinions of Drs. Wilson and Vandenberg, and rely on the State agency consultants' reports, was supported by substantial evidence in the record.   Where, as here, the ALJ has

conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision.  *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  It is therefore respectfully RECOMMENDED:

The application for a period of disability and disability insurance benefits be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 5th day of July, 2012.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**



<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).